[Civ. No. 18508. First Dist., Div. One. Sept. 14, 1959.]

JOHN G. OPPENHEIMER, Appellant, v. ALLEN W. ASHBURN et al., Defendants; THOMAS P. WHITE et al., Respondents.

John G. Oppenheimer, in pro. per., for Appellant.

Stanley Mosk, Attorney General, and Edward M. Belasco, Deputy Attorney General, for Respondents.

TOBRINER, J.—Plaintiff's complaint alleges liability of defendant judges under a statute which calls for a forfeiture of an amount not exceeding $5,000 for refusal to grant an order for a writ of habeas corpus "after a proper application is made." As we point out *infra*, the complaint succumbs to a general demurrer because it consists of conclusionary plead-

ings, and, because, under plaintiff's theory that the section applies to the exercise of judicial judgment, it fails to state a cause of action since the statute is unconstitutional. We shall point out, likewise, that the court properly sustained the special demurrer as to misjoinder of causes and parties. We shall, finally, explain why we have concluded that trial costs were improperly granted to defendants.

Plaintiff's complaint, filed on December 6, 1957, charged Justices Ashburn, Richards and Fox with violating section 1505 of the Penal Code in that they "wilfully and unlawfully" on August 14, 1957, denied plaintiff a writ of habeas corpus. Plaintiff therefore sought damages of $5,000 from each justice. Oppenheimer amended his complaint on December 17, 1957, repleading Count I of his first complaint, and alleging in Count II that Justices White, Doran and Fourt on December 26, 1956, violated the named section of the Penal Code in that: "[E]ach being then and there [Los Angeles County] judges . . . did wilfully, unlawfully and maliciously fail and refuse to grant an order for a writ of habeas corpus, after a verified and proper application therefor was made and presented to each of them . . . on behalf of . . . [Oppenheimer], to his damage . . . of $5,000. . . ."

Defendants White, Doran and Fourt demurred to this complaint on the grounds of: (1) failure to state facts sufficient to constitute a cause of action; (2) improper joinder of causes of action in that Counts I and II related to separate and distinct transactions; and (3) misjoinder of parties. The court on February 5, 1958, sustained this demurrer with ten (10) days' leave to amend. On March 25, 1958, defendants White, Doran and Fourt, pursuant to section 581, subdivision 3 of the Code of Civil Procedure, moved to dismiss for failure of plaintiff to amend within the designated time. The court thereafter signed a "Judgment of Dismissal," and awarded costs of trial to the defendants. Subsequently, plaintiff moved to "strike, tax and deny" these costs claimed by defendants; this motion was denied. Plaintiff appeals from the judgment of dismissal, and the order denying his motion to strike, tax and deny all costs claimed by the defendants.

Since the crux of the complaint charges an alleged violation of Penal Code, section 1505, we set forth the section: "If any Judge, after a proper application is made, refuses to grant an order for a writ of habeas corpus, or if the officer or person to whom such writ may be directed, refuses obedience to the command thereof, he shall forfeit and pay to the person ag-

grieved a sum not exceeding five thousand dollars, to be recovered by action in any Court of competent jurisdiction.''

As we have stated, we have found the complaint subject to a general demurrer upon two separate and independent grounds. ■ We turn to the first: the complaint, framed on a structure of bare conclusionary pleadings, cannot stand.

*Lincoln* v. *Fox* (1959), 168 Cal.App.2d 31 [335 P.2d 161], is decisive as to this issue. The First District Court of Appeal, Second Division, speaking through Justice Murray Draper, passing on almost identical facts, succinctly disposes of appellant's complaint: ''Application for the writ of habeas corpus is made by petition. 'If the imprisonment is alleged to be illegal, the petition must also state in what the alleged illegality consists.' (Pen. Code, § 1474.)

''The amended complaint alleges only that each judge 'did unlawfully fail and refuse' to grant an order for the writ after 'proper application therefor'. . . . This petition alleges that petitioner is confined 'under a void and invalid order of contempt, made by the Superior Court.' ...

''It is apparent that these allegations are but conclusions. An appellate court is entitled to and does 'require of a convicted defendant that he allege with particularity the facts upon which he would have a final judgment overturned.' ...

■ Plaintiff, seeking damages, cannot claim the benefit of greater presumptions than attach to an incarcerated person seeking relief from imprisonment.'' (P. 36.)

■ Obviously the conclusionary averments of the instant complaint are not admitted by demurrer (*Howard* v. *City of Los Angeles* (1956), 143 Cal.App.2d 195, 197 [299 P.2d 294]); they tender no issues of fact (*Branham* v. *Mayor & Common Council of San Jose* (1864), 24 Cal. 585); ''add nothing to the substantive averments of the complaint'' (*Vallindras* v. *Massachusetts etc. Ins. Co.* (1954), 42 Cal.2d 149, 151 [265 P.2d 907]); and are valueless in the disposition of the true issues of a controversy.

The conclusions of law in the instant complaint failed to state a cause of action; the court properly sustained the demurrer. The dismissal of the complaint upon motion of respondents was but the natural sequence of the failure to amend.

We proceed to the substantive question of the validity of section 1505 itself. In passing, we note the Legislature at its 1959 session amended the section to delete all reference to judges, retaining it only as to an ''officer or person to

whom a writ of habeas corpus is directed." (Senate Bill No. 648, ch. 559 of Cal. Stats. 1959 [West's Cal. Legislative Service, p. 769].) We must, of course, base our decision on the state of the law as of the date the complaint was filed. We do not believe the section can be constitutionally sustained.

We shall point out that the decisions of this state uniformly and consistently grant immunity to judges in the exercise of their judicial functions. The bedrock of this principle lies in the essential requirement for an independent judiciary in the structure of our government. And we shall set forth the force of these considerations against any legislative attempt to shackle such independence, particularly as it affects the concept of separation of powers.

The clear line of California decisions begins with the early case of *Turpen* v. *Booth* (1880), 56 Cal. 65 [38 Am.Rep. 48], which held that since a grand juror served in a quasi-judicial status he was not civilly responsible, no matter how erroneous his findings or how malicious his motive, for his action on the grand jury. In arriving at this holding the California Supreme Court quoted favorably from *Bradley* v. *Fisher* (1871), 13 Wall. (U.S.) 335, 351 [20 L.Ed. 646], as follows: " '. . . [J]udges of courts of record of superior or general jurisdiction are not liable to civil actions for their judicial acts, *even when such acts are in excess of their jurisdiction,* and are alleged to have been done maliciously and corruptly. . . .' "

The court soon followed this holding in *Pickett* v. *Wallace* (1881), 57 Cal. 555. Here the Supreme Court, having adjudged appellant guilty of contempt of court, fined and sentenced him to imprisonment. Appellant sued Wallace, Chief Justice, and several associate justices for $100,000, alleging that defendants, sitting as a court, knew that he had not committed contempt, and that the court, not having acquired jurisdiction over his person, had "maliciously" adjudged him guilty. The lower court sustained defendants' demurrer. In affirming, the Supreme Court cited *Turpen* v. *Booth, supra,* (1880), 56 Cal. 65 [38 Am.Rep. 48], and stated: "We are not aware of any principle upon which this action can be maintained. There is no question but that the Supreme Court of this State had jurisdiction to adjudge as to contempts, and to punish therefor." (P. 557.)

Not until many years later did the issue again arise. In *Perry* v. *Meikle* (1951), 102 Cal.App.2d 602 [228 P.2d 17], plaintiff sued Judge Twain Michelsen for false imprisonment

as a result of plaintiff's contempt of court. Defendant Michelsen filed a general demurrer, which the lower court sustained without leave to amend. The appellate court in affirming stated: "[I]t is clear from the complaint and exhibits that Judge Michelsen was acting as superior judge in a matter over which he had jurisdiction, that the proceeding was regular in all respects, and that there would be no basis for any action against him, even if he were not entitled to immunity from civil liability under the well-established and sound rule of public policy so well expressed by Justice Brewer of the U. S. Supreme Court, sitting as a circuit justice in *Cooke* v. *Bangs*, 31 F. 640, 642, as follows: 'With respect to all judicial officers . . . the settled law of the supreme court of the United States . . . is that, where they act within their jurisdiction, *they are not* amenable to any civil action for damages. No matter what their motives may be, they cannot be inquired into.'" (Italics added; p. 605.) The court quoted from *Platz* v. *Marion*, 35 Cal.App. 241, at page 248 [169 P. 697], to the effect that "a judge could not be either respected or independent if his motives for his official actions or his conclusions, no matter how erroneous, could be put in question at the instance of every malignant or disappointed suitor." (P. 606.)

In the recent case of *Singer* v. *Bogen* (1957), 147 Cal.App. 2d 515 [305 P.2d 893], in which plaintiff filed a suit for false imprisonment against defendants who were alleged to have wrongfully detained plaintiff's daughter in their capacity as judges of the juvenile court, the appellate court upheld the sustained demurrer and stated: "Great care must be taken not to restrict the absolution from liability where the judge performs, or purports to perform his official functions . . . only to situations where the judge has jurisdiction. . . ." (P. 524.)

Thus the civil immunity of the judiciary in the performance of judicial functions is deeply rooted in California law. The tripartite concept of our government forbids the destruction of that immunity at the hands of either the other two branches, whether legislative or executive. In this respect the validity of the section, as interpreted by appellant, differs from the role of the English statute which was the ostensible progenitor of this section.

The origin of the section apparently lies in 31 Charles II, chapter 2, section 9, which provides: "[I]f . . . any judge . . . in vacation time . . . shall deny any writ of habeas corpus by

this Act required to be granted . . . they shall severally forfeite to the prisoner or party grieved the summe of five hundred pounds. . . ." Pollock (The Law of Torts, 7th ed., 1904) notes this statute as an exception to the general rule of judicial immunity: "The rule is that 'no action will lie against a judge for any acts done or words spoken in his judicial capacity in a court of justice.'. . . It is founded on the necessity of judges being independent in the exercise of their office. . . . But . . . the judge must show that at the time of the alleged wrong-doing some matter was before him in which he had jurisdiction. . . ." (Pp. 113-114.)

Such an exception may survive in England because of the special nature of its government but it cannot be integrated into our own. The power of Parliament to impose liability upon judges differs vastly from the power of the Legislature to do so. 3 Stephen's Commentaries On the Laws of England (21st ed., 1950) points out: " [T]here is in law nothing which Parliament may not do if it chooses to do it by the full formality of a legislative act. It is not open to any court within the realm to question the validity of an Act of Parliament." (P. 288.)

In contrast with this relationship of court and legislature in England, article III, section 1, of the California Constitution states: "The powers of the government of the State of California shall be divided into three separate departments— the legislative, executive, and judicial; and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to either of the others, except as in this Constitution expressly directed or permitted."

We hardly need to emphasize at this late date that the doctrine of judicial supremacy as to the constitutionality of acts of the Legislature is basic to our concept of government. (11 Cal.Jur.2d, § 56, p. 376.) The California Supreme Court has characterized the doctrine as a "truism of the law." (*Leavitt* v. *Lassen Irrigation Co.* (1909), 157 Cal. 82, 92 [106 P. 404, 29 L.R.A. N.S. 213].) And in *Earle* v. *San Francisco Board of Education* (1880), 55 Cal. 489, the court in holding a statute unconstitutional stated: "To maintain the Constitution as it is, is our first duty, and whenever it is encroached upon, we are bound to assert its supremacy." (P. 493.)

Indeed our courts have applied the correlative doctrines of judicial supremacy and separation of powers to legislation

which invades the judicial prerogative and very recently to attempted encroachment upon legislative civil immunity.

As to judicial prerogative, *Austin* v. *Lambert* (1938), 11 Cal.2d 73 [77 P.2d 849, 115 A.L.R. 849], invalidated Code of Civil Procedure, section 170.5, which gave a party to an action the right of peremptory challenge of a judge assigned to try or hear the case. The court said: "Under the Constitution of this state a superior judge has certain powers and duties to perform. . . . One of those duties is to hear and determine causes presented to him unless in a particular cause he is disqualified or unable to act. . . .

"The judicial department has recognized that reasonable regulations may be made by the legislative branch in the matter of prescribing certain disqualifications of a judge to act." (P. 75.) But Code of Civil Procedure, section 170.5, "must . . . be held to be unwarranted and unlawful interference with the constitutional and orderly processes of the courts." (P. 79.)

As to legislative civil immunity, the recent case of *Hancock* v. *Burns* (1958), 158 Cal.App.2d 785 [323 P.2d 456], again gives expression to the concept of separation of powers. Upholding the civil immunity of members of a California Legislative Committee who had been sued for recommending to plaintiff's employer that plaintiff be discharged after he had refused to answer certain questions of the committee on the basis of the privilege against self-incrimination, the court said: "One of the basic foundations of our constitutional government is to be found in the separation of powers. This doctrine has been recognized as essential to a free form of government wherein public officers may perform their duties untrammelled by fear of sanction in the form of personal liability if it transpires that their acts were unwise or based upon a misinterpretation of the law. Much has been written, commencing with Montesquieu in the 18th century, and continuing up to date, regarding the necessity or advisability of continuing the doctrine of separation of powers." (P. 793.)

Our research discloses only one case that directly probes the constitutionality of a statute which imposes civil liability upon judges for refusal of the writ: *State* v. *Dobson* (1896), 135 Mo. 1 [36 S.W. 238]. Although the court's discussion is dicta, since in that case the writ was granted, the opinion analyzes the validity of section 5402 of the Missouri habeas corpus act: "[U]nder the express provisions of article 3 of our state constitution, which divides the powers of government

into three distinct departments,—the legislative, executive, and judicial,—and forbids either of those departments to exercise any power properly belonging to either of the others, 'except in the instances in this constitution expressly directed or permitted,' the legislature of this state has, in our opinion, no power to provide a penalty for a judge or court simply because a writ of habeas corpus is denied, which denial is based upon an honest endeavor to discharge what is believed to be the demands of recognized and imperative judicial duty.'' (P. 242.)

We therefore conclude that if the section is construed to mean that a judge in refusing to grant an order for a writ of habeas corpus, on the merits, must do so at pain of forfeiture of the named amount, the section is unconstitutional. The process of judgment cannot be objective if it is weighted so that when rendered one way the judge is immune and, in the opposite way, subject to suit. Objectivity is not a quality that can be strained and baited; it cannot be subjected to a rewarded immunity if exercised to grant a writ and to a five thousand dollar penalty if a writ ''after a proper application'' is refused. Independence of judgment cannot truly survive the impediment of reward and punishment. The judge who must choose between a decision that leads to safety and one that may mean personal monetary loss is not a free judge.

History tells that tragedy marks the loss of an independent judiciary. The subservient judge is the sad servant of totalitarianism. Correlatively, democracy demands and ultimately survives by the judge who cannot be controlled. Even in the United States the democratic and judicial process can be sorely tested by the sway of mass opinion. American history itself records periods of extremism in such times as those of the Alien and Sedition laws, the post-war years of World War I, and the recent period characterized as ''McCarthyism.'' We know that today there are techniques by which mass opinion can be contrived. The need for an independent judiciary becomes correspondingly stronger.

While the instant attempt to insure the issuance of habeas corpus upon the merits may not seem to be a radical attack upon judicial immunity, it touches upon the whole principle. The road to the end of immunity for one writ leads inexorably to the end of immunity for the next. The principle of immunity cannot be cut and quartered to the particular measure

the Legislature may have in view. It survives as a whole or it ends in pieces.

Having concluded that the court properly sustained the general demurrer, we consider briefly the special demurrer and the motion to tax costs.

Since the court correctly upheld a special demurrer as to misjoinder of causes of action and parties, appellant's failure to amend was enough in itself to dispose of the complaint. ▮ As we set out at the commencement of this opinion, the complaint pleaded two causes of action, the first alleging that on August 14, 1957, respondents Ashburn, Richards and Fox violated section 1505 of the Penal Code, and the second alleging that respondents White, Doran and Fourt violated it on December 26, 1956.

The court properly sustained the demurrer upon the ground of misjoinder of causes of action. Section 427 of the Code of Civil Procedure provides that causes of action for injuries to the person may be united only if the causes of action so united "affect all the parties to the action." Count I does not affect respondents, a fact which appellant admits in his brief at page nine: "[T]he first cause of action . . . is none of the . . . respondents' business. . . . They are in no way affected . . . thereby."

Nor can respondents White, Doran or Fourt be joined as necessary parties. ▮ Witkin defines a necessary party as one "whose presence is *not essential* to the jurisdiction of the court to determine the cause. Their presence may be highly desirable because of their interests in the subject matter of the suit, and their presence may be necessary to a determination of the entire controversy between the parties, but their interests are *separable*." (2 Witkin, California Procedure, § 73, p. 1050.) ▮ The alleged tortious denial of the judges in Count I and Count II constituted independent and disconnected events, separated in time by more than seven months. Respondents are merely persons who are alleged to have committed the same type of tort as the defendants named in Count I. They had no interest in the subject matter of Count I.

Finally, we turn to the award of costs. We have concluded that the award of trial costs to respondents, in the amount of $18.50, cannot be upheld.

▮ The Code of Civil Procedure, section 1033, provides that: "[T]he party in whose favor the judgment is ordered, and who claims his costs, must serve upon the adverse party,

and file at any time after the verdict or decision of the court, and not later than ten (10) days after the entry of the judgment, a memorandum of the items of his costs. . . ."

Respondents filed this judgment of dismissal on March 28, 1958, and their memorandum of costs on April 11, 1958. Appellant therefore claims that costs should have been taxed to respondents on the theory that the code section required that the memorandum of costs be filed within 10 days of March 28, 1958.

Since the statute requires that the memorandum be filed not later than "(10) days after the entry of the judgment," the words "after the entry of the judgment" must refer to the date of finality of judgment, the date from which the time for appeal commences from such judgment. In this instance that date would be March 28, 1958, when respondents filed the formal order of dismissal. (See *White, Doran and Fourt* v. *Ostley,* which follows, as to the effective time of this order.) The memorandum of costs filed 14 days *after* the effective time of the order of dismissal would constitute a tardy filing. Hence the granting of trial costs to respondents and the denial of appellant's motion to tax these costs to respondents should be reversed.

The judgment awarding costs to defendants-respondents is reversed. In all other respects the judgment is affirmed. In the interests of justice, and pursuant to rule 26 of the Rules on Appeal, respondents will recover their costs on appeal.

Bray, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 8, 1959, and appellant's petition for a hearing by the Supreme Court was denied November 10, 1959. White, J., did not participate therein.