[No. S031410. Apr. 28, 1994.]

OPHELIA Y. MOORE et al., Plaintiffs and Appellants, v.
MILTON CONLIFFE, Defendant and Respondent.

636

## COUNSEL

Von Till & Associates, Stephen F. Von Till, Jerry Wilhelm and Dan Grimmer for Plaintiffs and Appellants.

Gail K. Hillebrand, Brian W. Newcomb, Pillsbury, Madison & Sutro, William I. Edlund, Walter A. Allan and Joseph A. Hearst as Amici Curiae on behalf of Plaintiffs and Appellants.

Kennedy P. Richardson, Mark Palley, Lillian F. Hamrick, Craddick, Candland & Conti and Robert W. Lamson for Defendant and Respondent.

Proskauer, Rose, Goetz & Mendelsohn, Steven G. Drapkin, Gibson, Dunn & Crutcher, Richard Chernick, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole, Julia C. Wo, Heller Ehrman, White & McAuliffe, Stephen V. Bomse, Peter S. Hecker, Laurel E. Fletcher, Horvitz & Levy, Barry R. Levy, David S. Ettinger, Richard L. Hasen, William M. Pfeiffer and Judith K. Herzberg as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**GEORGE, J.—** ▮▮ ▬ ▬ In this case we must decide whether a witness who testifies at a deposition held in connection with a private, contractual arbitration proceeding is subject to being sued in a tort action on the basis of statements made in the course of such testimony, or instead, like any witness in a court proceeding, is immunized from tort liability by virtue of the "litigation privilege" embodied in Civil Code section 47, subdivision

(b) (hereafter section 47(b)).[1] As we shall explain, in view of the purpose and history of the litigation privilege and the numerous California decisions interpreting and applying the relevant statutory provision, we conclude that statements made in the course of a private, contractual arbitration proceeding are protected by the litigation privilege.

## I

The appeal in this case is from a judgment of dismissal entered after the sustaining of a general demurrer. Accordingly, in setting forth the relevant facts for purposes of our review, we are guided by the familiar rules applicable in this setting. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed. [Citation.]" (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].)

Plaintiffs are the mother, siblings and estate of DeWanda Atkinson, who died in March 1984, at 16 years of age, from hepatitis. Plaintiffs contend that DeWanda contracted this disease as a side effect of a drug, Isoniazid (also referred to as INH), that was prescribed for her because of her exposure to tuberculosis, and that she had ingested on a daily basis during the several months preceding her death.

After DeWanda's death, plaintiffs instituted a wrongful death action in San Mateo County Superior Court against DeWanda's health plan and physicians (hereafter referred to collectively as Kaiser), asserting that Kaiser had been negligent in prescribing and monitoring DeWanda's tuberculosis medication and that such negligence was the cause of DeWanda's death. Early in 1985, the parties to the civil proceedings stipulated that the action was subject to mandatory arbitration under the contractual provisions of the applicable Kaiser medical and hospital service agreement, and also stipulated that the civil action should be stayed pending arbitration. In view of the stipulation, the superior court, in March 1985, entered an order staying further proceedings in the civil action pending completion of the arbitration.

---

[1] Although the protection afforded by the statute is commonly denominated a "privilege," which creates a "privileged communication," section 47(b) does not create an evidentiary privilege that protects a communication from compelled disclosure. (See, e.g., *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168 [232 Cal.Rptr. 567, 728 P.2d 1202].) Instead, the section 47(b) privilege operates as a *limitation on liability*, precluding use of the protected communications and statements as the basis for a tort action other than for malicious prosecution. (See, e.g., *Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1193-1196 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 209 [271 Cal.Rptr. 191, 793 P.2d 524].) Thus, section 47(b) creates what in many other contexts is termed an "immunity" from suit.

Unless otherwise specified, all section references are to the Civil Code.

Sometime thereafter, Kaiser retained, as a medical expert, Dr. Milton Conliffe, the defendant in the proceeding now before us, to provide medical information regarding DeWanda, including his opinion as to the cause of her death.

The arbitration hearing on plaintiffs' claim against Kaiser began in October 1989. In December 1989, during a break in the hearing, plaintiffs scheduled a deposition with Dr. Conliffe, requesting that he produce documents relating to his review of DeWanda's case, including articles or writings he had reviewed, consulted, prepared, referred to, or relied upon in his work on the case.

When he appeared for his deposition, Dr. Conliffe produced only his personal resume. In his testimony at the deposition, Dr. Conliffe stated it was his opinion that DeWanda's death had resulted from viral hepatitis, rather than nonviral hepatitis, and therefore that the use of Isoniazid did not contribute to her death. In response to questions at the deposition, Dr. Conliffe also testified he had reviewed the articles and literature submitted by plaintiffs, but denied recalling or being aware of any medical literature that attributed hepatitis to the use of Isoniazid. When asked specifically about his own contributions to publications, Dr. Conliffe stated only that he had contributed certain "epidemiological information" to an article on "toxicity."

The complaint does not allege that Dr. Conliffe testified at the arbitration hearing itself or that his deposition testimony was introduced at that hearing. The complaint does allege, however, that Kaiser's position at the arbitration hearing was consistent with Dr. Conliffe's deposition testimony, namely, that DeWanda's death was caused by a form of viral hepatitis and was not drug induced. At the conclusion of the arbitration proceeding in January 1990, a majority of the arbitrators found that, although Kaiser had been negligent in the care and treatment of DeWanda, plaintiffs had failed to prove that the cause of her death was Isoniazid-induced hepatitis. On that basis, the arbitrators ruled in favor of Kaiser.

Sometime after the arbitrators had rendered their decision, plaintiffs' attorney discovered that in September 1989, three months prior to Dr. Conliffe's deposition, an article had been published in a medical journal by another physician, reviewing a number of hepatitis deaths in California attributed to Isoniazid, and that Dr. Conliffe, himself, had contributed information concerning DeWanda's case to the author of the article, allegedly as an example of Isoniazid-induced death. As noted above, the complaint alleged Dr. Conliffe did not disclose the existence of this article in testifying

at the deposition, and plaintiffs claimed the article demonstrated that Dr. Conliffe knowingly and intentionally provided false testimony at his deposition.

In May 1990, plaintiffs filed a petition in Alameda County Superior Court seeking to vacate the arbitration award. While that matter was pending, plaintiffs, in August 1990, filed the present separate tort action in Alameda County Superior Court. The two actions, along with the initial action filed by plaintiffs against Kaiser in 1984, were joined in a coordination proceeding (Cal. Rules of Court, rule 1501 et seq.) before the San Mateo County Superior Court. From the record before us, it appears that plaintiffs' petition to vacate the arbitration award has remained in abeyance pending resolution of the present matter.

In their initial complaint in the present tort action, plaintiffs, as a result of misconduct alleged to have occurred in the arbitration proceeding, sought to recover damages against Kaiser, Kaiser's attorneys in the arbitration action, and the neutral arbitrator who presided over the arbitration proceeding, but did not name Dr. Conliffe as a defendant. In October 1990, plaintiffs filed a first amended complaint in the action, setting forth a cause of action against Dr. Conliffe on a theory of "concealment and suppression of evidence." After Dr. Conliffe demurred to the first amended complaint, plaintiffs filed additional amendments to the complaint, adding causes of action against Dr. Conliffe for negligence, intentional and negligent misrepresentation, suppression of fact, civil conspiracy, breach of contract, and intentional infliction of emotional distress. Dr. Conliffe again demurred, asserting that his deposition testimony was privileged under section 47(b). Sustaining Dr. Conliffe's demurrer without leave to amend, the trial court dismissed the action against him with prejudice.

On appeal, the Court of Appeal reversed, concluding that the litigation privilege embodied in section 47(b) does not apply to a witness's testimony or to other statements made in the course of a private contractual arbitration proceeding, but only to testimony and statements made in a court proceeding. Accordingly, the Court of Appeal held that plaintiffs' action against Dr. Conliffe should be permitted to go forward to trial. Because of the importance of the issue, we granted review, limiting the issue to be argued before this court to the question "whether communications in connection with private arbitration proceedings are protected by the litigation privilege."

## II

Under the current provisions of section 47(b), the Legislature has accorded an absolute privilege or immunity to statements made in a number of

contexts: in any (1) legislative proceeding, (2) judicial proceeding, (3) other official proceeding authorized by law, or (4) proceeding authorized by law and reviewable by writ of mandate.[2] Although Dr. Conliffe argues that statements made in the course of a private, contractual arbitration proceeding properly can be viewed as falling within several of the subsections of section 47(b), he contends primarily that such statements come within the aegis of section 47(b)(2), which provides an absolute privilege to statements made in "any judicial proceeding"—the provision more commonly referred to as the "litigation privilege."

In *Silberg* v. *Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*), we had occasion to undertake a rather extensive examination of the nature and scope of the litigation privilege (which, at the time, was designated section 47, subdivision (2) [hereafter section 47(2)]).[3] We began our discussion in *Silberg* with a general overview of the application of the privilege: "In furtherance of the public purposes it is designed to serve, the privilege prescribed by section 47(2) has been given broad application. Although originally enacted with reference to defamation [citation], the privilege is now held applicable to any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution. [Citations.] Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, *even though the publication is made outside the courtroom and no function of the court or its officers is involved.* [Citations.]" (50 Cal.3d at pp. 211-212, italics added.)

We then proceeded to set forth the established parameters of the litigation privilege: "The usual formulation is that the privilege applies to any communication (1) *made in judicial or quasi-judicial proceedings*; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action. [Citations.]" (*Silberg*, *supra*, 50 Cal.3d at p. 212, italics added.)

After thus briefly summarizing the established scope and elements of the privilege, we went on in *Silberg* to discuss at some length the fundamental purposes served by the privilege. We explained: "The principal purpose of

---

[2] Section 47(b) currently provides in relevant part: "A privileged publication or broadcast is one made: [¶] . . . (b) In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure . . . ."

[3] At the time relevant to *Silberg*, section 47(2) read in pertinent part: "A privileged publication or broadcast is one made-[¶] . . . [¶] 2. In any . . . (2) judicial proceeding . . . ."

section 47(2) is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.] [¶] Section 47(2) promotes the effectiveness of judicial proceedings by encouraging 'open channels of communication and the presentation of evidence' in judicial proceedings. [Citation.] . . . Such open communication is 'a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings.' [Citation.] Since the 'external threat of liability is destructive of this fundamental right and inconsistent with the effective administration of justice' [citation], courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings." (*Silberg, supra,* 50 Cal.3d at p. 213.)

Noting that the United States Supreme Court, in *Briscoe* v. *LaHue* (1983) 460 U.S. 325, 333 [75 L.Ed.2d 96, 106, 103 S.Ct. 1108], had echoed these same policy considerations in describing the purposes of the absolute privilege accorded witnesses at common law, we observed in *Silberg* that California's statutory litigation privilege reflected a legislative determination that "witnesses should be free from the fear of protracted and costly lawsuits which otherwise might cause them either to distort their testimony or refuse to testify altogether. [Citations.]" (*Silberg, supra,* 50 Cal.3d at p. 214.)[4]

Furthermore, we went on in *Silberg* to point out that the litigation privilege serves a very important additional purpose, namely, ensuring the integrity and the finality of the ultimate resolution of the controversy that has been reached through the litigation process. We explained in this regard:

[4] In *Briscoe* v. *LaHue, supra,* 460 U.S. 325, 333-334 [75 L.Ed.2d 96, 106-107], the United States Supreme Court elaborated on this point, observing that "[a] witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. [Citation.] And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. [Citation.] Even within the constraints of the witness' oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. [Citation.] But the truthfinding process is better served if the witness' testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.' [Citation.]" (Fn. omitted.)

In addition, the court noted in *Briscoe* that "some courts expressed concern that, in the absence of a privilege, honest witnesses might erroneously be subjected to liability because they would have difficulty proving the truth of their statements. The result seemed inappropriate [to these courts] in light of the witness' duty to testify. [Citations.]" (460 U.S. at p. 333, fn. 13 [75 L.Ed.2d at p. 106].)

"[I]n immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result. [Citations.] . . . [¶] For our judicial system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause [of action] during the proceedings. To allow a litigant to attack the integrity of evidence after the proceedings have concluded, except in the most narrowly circumscribed situations, such as extrinsic fraud, would impermissibly burden, if not inundate, our justice system. [Citations.]" (*Silberg, supra,* 50 Cal.3d at p. 214.)[5]

In light of the purposes served by the litigation privilege, we ultimately held in *Silberg* that, contrary to a line of prior Court of Appeal decisions, a plaintiff could not avoid the effect of the privilege by alleging and establishing that a communication was not made for the purpose of promoting the "interest of justice." (*Silberg, supra,* 50 Cal.3d at pp. 216-219.)

■ It is apparent, upon even brief reflection, that the purposes of the litigation privilege, as described in *Silberg,* strongly support application of the privilege to a witness who testifies in the course of a private, contractual arbitration proceeding. Because such a proceeding is designed to serve a function analogous to—and typically to eliminate the need to resort to—the court system (see, e.g., *Blanton* v. *Womancare, Inc.* (1985) 38 Cal.3d 396, 402, fn. 5 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109]), the need for an absolute privilege to foster the giving of complete and truthful testimony is as vital in the private contractual arbitration setting as it is in a court proceeding. (See, e.g., *Corbin* v. *Washington Fire and Marine Insurance Co.* (D.S.C. 1968) 278 F.Supp. 393, 397, affd. 398 F.2d 543.) Furthermore, the risk that a witness's fear of potential liability either will deter the witness from testifying voluntarily at all, or in as candid and complete a manner as is essential to the truthseeking mission of the process, is as great in the arbitration setting as in a court proceeding. (See, e.g., *Sturdivant* v. *Seaboard Service System, Ltd.* (D.C.App. 1983) 459 A.2d 1058, 1059.) Moreover,

---

[5]This reference to "extrinsic fraud" apparently relates to the narrow doctrine permitting a collateral attack on a judgment that has been obtained by "extrinsic fraud," i.e., under circumstances in which "the aggrieved party [has been] deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense." (8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in Trial Court, § 204, p. 602.) The court in *Silberg* explicitly recognized that a "fraudulent communication" or "perjured testimony" made in the course of a judicial proceeding is absolutely privileged and does not provide a basis for avoiding the finality of the decision made in the litigation process itself. (*Silberg, supra,* 50 Cal.3d at p. 218.)

because a witness may be compelled to testify in an arbitration proceeding as well as in a court proceeding (see Code Civ. Proc., §§ 1282.6 [subpoenas], 1283 [depositions]), the unfairness of subjecting a witness to a potentially burdensome tort action on the basis of testimony he or she legally is obligated to provide is as significant a problem in the arbitration setting as in a court proceeding.

Finally, the fundamental interest in protecting the integrity and finality of dispute resolution from "an unending roundelay of litigation" (*Silberg, supra,* 50 Cal.3d at p. 214) unquestionably is as applicable in the arbitration context as in a court proceeding. Indeed, as we emphasized in our recent decision in *Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 10 [10 Cal.Rptr.2d 183, 832 P.2d 899], the importance of ensuring the finality of the arbitrator's decision frequently is a principal impetus for "the parties' choice of an arbitral forum over a judicial one. The arbitrator's decision should be the end, not the beginning, of the dispute." Moreover, as starkly demonstrated by the facts of the present case, because a party's right to appeal an arbitration award is extremely limited (see *Moncharsh, supra,* 3 Cal.4th at pp. 8-33), there is a risk in the arbitration setting, even greater than that present in the court setting, that a losing party will seek to circumvent the applicable limitations on review by filing a subsequent tort action against one or more of the participants in the arbitration proceeding on the basis of statements made in that proceeding. Although plaintiffs' attorney suggested at oral argument that a witness or other participant in an arbitration proceeding who has been subjected to an unjustified tort action always may respond by filing a malicious prosecution action, that suggestion of a *third* round of lawsuits simply brings into sharp focus the "unending roundelay of litigation" (*Silberg, supra,* 50 Cal.3d at p. 214) invited by plaintiffs' present lawsuit. Consequently, section 47(b)(2)'s objective of preserving the finality of dispute resolution applies with special force in the arbitration context.

## III

■ Plaintiffs contend, however, that even if the purposes of the litigation privilege embodied in section 47(b)(2) support application of the privilege to statements made in contractual arbitration proceedings, the language of section 47(b)(2) precludes application of the statute to such proceedings. Plaintiffs maintain that if the litigation privilege is to be applied to private arbitration proceedings, the Legislature must amend section 47(b)(2) specifically to so provide. Plaintiff's argument rests upon the premise that the reference in section 47(b)(2) to "any . . . judicial proceeding" does not encompass private contractual arbitration proceedings. As we shall explain, plaintiffs' argument is refuted both by the governing precedent interpreting the reach of the litigation privilege, and by the history of this privilege.

## A

To begin with, as is made clear in *Silberg*'s summary of the essential components of the litigation privilege, the reference to "any judicial proceeding" in section 47 has been interpreted in past California cases to apply, not only to court proceedings, but also to those "quasi-judicial" proceedings, such as private arbitration proceedings, that are functionally equivalent to court proceedings. (See *Silberg, supra,* 50 Cal.3d 205, 212 ["The usual formulation [of the litigation privilege] is that the privilege applies to any communication (1) made in judicial *or quasi-judicial proceedings* . . . ." (Italics added).]) Although plaintiffs correctly note that the reference to "quasi-judicial proceedings" in *Silberg* was dictum because *Silberg* itself involved a statement made in the course of a court proceeding, plaintiffs are mistaken in asserting that no California decision has held directly that the section 47(b)(2) litigation privilege applies to statements made in the course of a private arbitration proceeding.

In *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417]—decided five years prior to the *Silberg* decision—we explicitly stated: "Civil Code section 47 provides in relevant part that: 'A privileged publication or broadcast is one made . . . [¶] 2. In any . . . (2) judicial proceeding, or (3) in any other official proceeding authorized by law. . . .' Plaintiff concedes, *as he must,* that *an arbitration hearing falls within the scope of this privilege because of its analogy to a judicial proceeding.*" (Italics added.) Although plaintiffs attempt to minimize the significance of this statement in *Ribas* by claiming that it too constitutes "dictum," a careful review of the *Ribas* decision demonstrates that the stated principle was in fact an essential element of the holding in that case.

In *Ribas* v. *Clark, supra,* 38 Cal.3d 355, a couple (the Ribases) entered into a court-approved property settlement agreement in a marital dissolution proceeding in which the wife was not represented by counsel. After the final judgment of dissolution, the wife consulted a tax attorney, who advised her that the settlement had adverse tax consequences for her. When she thereafter informed her husband that she had retained an attorney, the husband immediately telephoned the attorney and a heated exchange ensued. Shortly thereafter, the wife went to the place of business of a friend (Clark), asked whether she could use the telephone to call her husband, and, at the same time, requested that Clark listen to the conversation on an extension phone. Without informing the husband, Clark did so.

The wife subsequently filed an action to set aside the dissolution, alleging that her husband had procured it by fraud. Thereafter, as we explained in

*Ribas*, "[d]uring an arbitration hearing, [Clark] testified to her recollection of the conversation on which she had eavesdropped. In particular, she stated that she heard [the husband] concede he had prevented his wife from obtaining counsel during the dissolution proceedings." (38 Cal.3d at p. 358.)

Although the arbitrator ruled in the husband's favor, he subsequently filed a new lawsuit against his wife's friend (Clark)—the *Ribas* v. *Clark* litigation—seeking damages for violations of criminal statutes prohibiting various forms of eavesdropping, as well as for invasion of privacy and intentional infliction of emotional distress. The trial court sustained a demurrer and dismissed the complaint, and, on appeal, the defendant Clark defended the trial court judgment on two grounds: (1) that her eavesdropping on the plaintiff husband's telephone conversation did not violate the statutory privacy provisions in question, and (2) that, in any event, the husband was barred, by the provisions of section 47, from obtaining tort recovery against her for the damage he alleged he had suffered as a result of her testimony at the arbitration hearing regarding the overheard conversation.

After concluding initially that Clark's eavesdropping on the husband's telephone conversation did violate the relevant privacy statutes (*Ribas* v. *Clark, supra*, 38 Cal.3d at pp. 359-363), the court in *Ribas* turned to the section 47 issue, stating: "Defendant next relies on the privilege accorded to statements published *in judicial proceedings. This contention has merit.*" (38 Cal.3d at p. 363, italics added.) The court began its legal analysis of the privilege issue with the statement quoted above: "Civil Code section 47 provides in relevant part that: 'A privileged publication or broadcast is one made . . . [¶] 2. In any . . . (2) judicial proceeding, or (3) in any other official proceeding authorized by law. . . .' Plaintiff concedes, *as he must*, that an arbitration hearing falls within the scope of the privilege because of its analogy to a judicial proceeding." (*Id.* at p. 364, italics added.) The court then continued: "Nonetheless, [plaintiff] urges that the 'tortious nature and purpose' of defendant's alleged action takes his cause of action outside the privilege of section 47 . . . ." (*Ibid.*)

The court in *Ribas* then analyzed and rejected this argument, concluding that the purpose of the "judicial proceeding" privilege supported application of the privilege to the claims brought by the plaintiff, explaining: "Underlying the privilege is the vital public policy of affording free access to the courts and facilitating the crucial functions of the finder of fact. [Citation.] 'The resulting lack of any really effective civil remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say.' (Prosser, Law of Torts (4th ed. 1971) p. 778.)" (*Ribas* v. *Clark, supra*, 38 Cal.3d at pp. 364-365.)

As a result of this conclusion, the court in *Ribas* held: "Thus, to the extent plaintiff alleges in his complaint that he suffered actual injury solely *as a result of defendant's testimony at the arbitration hearing, his cause of action* under Penal Code section 637.2 [the privacy statute] *must fail.*" (*Ribas* v. *Clark, supra,* 38 Cal.3d at p. 365, italics added.)

Although the court thus held that the plaintiff was barred, by the litigation privilege, from recovering any damages for any injury suffered as a result of the defendant's testimony at the arbitration hearing, the court further held that, because the privacy statute authorized a civil award of $3,000 for each violation of the statute despite a party's inability to prove actual injury, and because, on the facts of that case, a violation of the privacy act—the defendant's eavesdropping—was alleged to have taken place "during a conversation with [the plaintiff's] wife *prior to, and not in the context of, any judicial proceeding*" (*Ribas* v. *Clark, supra,* 38 Cal.3d at p. 365, italics added), the plaintiff in *Ribas* was entitled to proceed "to pursue his statutory remedy of a civil lawsuit for $3,000, *even though the judicial privilege bars his recovery for the only actual damage he claims to have suffered.*" (*Ibid.,* italics added.)

As this review of the *Ribas* decision reveals, this court's explicit statement in *Ribas* that "an arbitration hearing falls within the scope of this privilege because of its analogy to a judicial proceeding" (*Ribas* v. *Clark, supra,* 38 Cal.3d at p. 364) cannot properly be characterized as dictum, but rather was essential to the court's holding that the plaintiff in that case was barred, by the litigation or judicial proceeding privilege, from obtaining damages for the injuries suffered as a result of the defendant's testimony at the arbitration hearing. If the litigation privilege had not been applied to the defendant's testimony at the arbitration hearing, the plaintiff's recovery in that case would not have been so limited. Thus, the statement in question in *Ribas* constitutes a holding, not dictum.

In addition to asserting that the foregoing statement in *Ribas* was dictum, plaintiffs argue that the *Ribas* decision properly can be distinguished from the present case on the ground that the arbitration proceeding at which the defendant in *Ribas* had testified was a "judicial arbitration" proceeding (see Code Civ. Proc., § 1141.10 et seq.), rather than a private contractual arbitration proceeding (see Code Civ. Proc., § 1280 et seq.), and consequently that our holding in *Ribas* should be limited only to statements made in the course of a "judicial arbitration" proceeding.[6] But the *Ribas* opinion does not discuss (or even disclose) whether the arbitration in that case was conducted

---

[6]"Judicial arbitration" is a term of art that refers to the procedural scheme set forth in section 1141.10 et seq. of the Code of Civil Procedure. Although there are a number of

pursuant to a contractual agreement or pursuant to the "judicial arbitration" statutes, and there is absolutely nothing in *Ribas* to suggest that our holding in that case turned upon this point. To the contrary, the opinion's reasoning indicates that section 47's judicial proceedings privilege applies to *any* "arbitration hearing" that is functionally equivalent to a court proceeding, because of the "analogy [of such a hearing] to a judicial proceeding." (38 Cal.3d at p. 364.) Thus, contrary to plaintiffs' claim, we conclude that this court's decision in *Ribas* constitutes a direct holding that, as a general matter, the section 47 privilege applies to all arbitration proceedings.

This understanding of the *Ribas* decision, that it is not limited to "judicial arbitration" proceedings, is confirmed by subsequent Court of Appeal decisions, which have relied upon *Ribas* in declaring that this privilege applies to statements made in—or in good faith contemplation of—a private contractual arbitration proceeding, treating such proceedings as analogous to judicial proceedings. (See *ITT Telecom Products Corp.* v. *Dooley* (1989) 214 Cal.App.3d 307, 314-317, & fn. 7 [262 Cal.Rptr. 773] [private commercial arbitration]; *Wallin* v. *Vienna Sausage Manufacturing Co.* (1984) 156 Cal.App.3d 1051, 1056 & fn. 5 [203 Cal.Rptr. 375] [labor arbitration].) A leading treatise on California law provides further indication that the *Ribas* decision generally has been understood in just this fashion. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 515(e), p. 592 ["Because of its similarity to a judicial proceeding, an arbitration proceeding is within the scope of the privilege, and causes of action based on injury stemming from arbitration testimony are barred. (*Ribas* v. *Clark* . . . .)"].)

The *Ribas* case was decided in 1985, and since then the Legislature has amended section 47 on numerous occasions without ever indicating its disagreement or disapproval of the *Ribas* holding that the "judicial proceeding" or litigation privilege applies to private arbitration proceedings. Thus, even if there was any reason to question the validity of *Ribas*'s interpretation of section 47 as an original proposition, principles of stare decisis as applied to questions of statutory interpretation would counsel against overturning the *Ribas* holding at this time.

---

differences between "judicial arbitration" and the traditional contractual arbitration process authorized by section 1280 et seq. of the Code of Civil Procedure (see *Blanton* v. *Womancare, Inc., supra,* 38 Cal.3d 396, 401-402 & fn. 5), in both processes the proceeding consists of an adjudicatory proceeding presided over by one or more neutral, nongovernmental arbitrators, whose function typically is to resolve a dispute that otherwise would be subject to resolution by a court. From the perspective of a witness who is called upon to testify in an arbitration proceeding, the two types of arbitration proceedings are virtually indistinguishable, and there appears to be no persuasive reason for immunizing a witness against subsequent tort liability in one context but not the other.

## B

Furthermore, even if we were to view the issue before us as a matter of first impression, we would conclude that the litigation privilege of section 47(b)(2) applies to statements made in a private, contractual arbitration proceeding.

As we already have discussed (see pt. II, *ante*), the significant purposes furthered by section 47(b)(2)—i.e., encouraging witnesses to provide open and candid testimony, and preserving the integrity and finality of dispute resolution—strongly support application of the privilege to private arbitration proceedings. Additionally, as will be demonstrated, the history of section 47(b)(2) supports such an application.

The various privileges embodied in section 47 are derived from, and in general represent a codification of, the comparable privileges that originated in, and were developed by, the common law courts. (See, e.g., *Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 710 [21 Cal.Rptr. 557, 371 P.2d 293]; *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 379 [295 P.2d 405].)[7]

The relevant common law privilege applicable to witnesses is set forth in section 588 of the Restatement Second of Torts as follows: "A witness is absolutely privileged to publish defamatory matter concerning another in communications *preliminary to a proposed judicial proceeding or as part of a judicial proceeding* in which he is testifying, if it has some relation to the proceeding." (Italics added.) In describing the scope of the term "judicial proceeding" as used in this section, comment *d* to section 588 specifically provides: "Judicial proceedings include all proceedings in which an officer or tribunal exercises judicial functions, as to which see § 585, Comments *c* and *f. As indicated there, an arbitration proceeding may be included*." (Rest.2d Torts, § 588, p. 251, italics added.)

Section 585 of the Restatement Second of Torts, the section to which comment *d* of section 588 of the Restatement refers, embodies the related

[7]As originally enacted in 1872, section 47 provided in relevant part: "A privileged publication is one made: [¶] . . . [¶] 2. In testifying as a witness in any proceeding authorized by law to a matter pertinent and material, or in reply to a question allowed by the tribunal." In 1874, the pertinent portion of section 47 was amended to read: "A privileged publication is one made: [¶] . . . [¶] 2. In any legislative or judicial proceeding, or in any other official proceeding authorized by law . . . ."

Although section 47 thereafter was amended at various times to change the numerical designations within the provision, the only additional substantive change in the pertinent portion of section 47 occurred in 1979, when the subdivision currently designated (b)(4)—relating to proceedings reviewable by writ of mandate—was added in response to this court's decision in *Hackethal* v. *Weissbein* (1979) 24 Cal.3d 55 [154 Cal.Rptr. 423, 592 P.2d 1175, 9 A.L.R.4th 791]. We discuss below the 1979 amendment to section 47(b). (See, *post*, pp. 652-653.)

common law privilege or immunity applicable to judges or other officers performing a judicial function. Section 585 provides: "A judge or other officer performing a judicial function is absolutely privileged to publish defamatory matter in the performance of the function if the publication has some relation to the matter before him." Comment *c* of section 585 (which also is referred to in comment *d* of section 588) states, in relevant part: "The exercise of the judicial function is also not confined to tribunals created by legislative provisions. Thus, in a grievance proceeding arising under a collective bargaining agreement, *the arbiter is exercising a judicial function, and the indications are that the protection of this Section extends to him as well.*" (Rest.2d Torts, § 585, pp. 245-246, italics added.)

As these sections reveal, at common law the absolute privilege or immunity accorded both witnesses and officers performing a judicial function were parallel privileges; the scope of the term "judicial proceeding," to which the witness privilege applied, was understood to include proceedings in which an officer or tribunal exercises judicial functions (and in which the officer thereby is accorded the protection of an absolute privilege). It long has been recognized that, in private arbitration proceedings, an arbitrator enjoys the benefit of an arbitral privilege because the role that he or she exercises is analogous to that of a judge. (See Domke, *The Arbitrator's Immunity From Liability: A Comparative Survey* (1971) 1971 U. Tol. L.Rev. 99, 99 ["There is hardly any aspect of arbitration law and practice more settled, both in domestic and international relations, than the immunity of arbitrators from court actions for their activities in arriving at their award."]; see generally, Domke on Commercial Arbitration (rev. ed. 1991) § 23:01, pp. 351-354.) This rule—immunizing arbitrators in private contractual arbitration proceedings from tort liability—is well established in California. (See Code Civ. Proc., § 1280.1; *Baar* v. *Tigerman* (1983) 140 Cal.App.3d 979, 982 [211 Cal.Rptr. 426, 41 A.L.R.4th 1004] [recognizing broad arbitral immunity prior to enactment of Code Civ. Proc., § 1280.1].) Thus, our conclusion in *Ribas* that a private arbitration proceeding properly is considered a "judicial proceeding" for purposes of section 47(b)(2) follows logically from the parallel treatment accorded witnesses and officers who exercise a judicial function under the common law.

Furthermore, our holding in *Ribas* that the litigation privilege applies to testimony at a private arbitration proceeding also is consistent with the great weight of authority in those other jurisdictions that have addressed the issue. (See, e.g., *Corbin* v. *Washington Fire and Marine Insurance Co., supra,* 278 F.Supp. 393, 395-399, affd. 398 F.2d 543; *Odyniec* v. *Schneider* (1991) 322 Md. 520 [588 A.2d 786, 789-793]; *Shearson Hayden Stone, Inc.* v. *Liang* (N.D.Ill. 1980) 493 F.Supp. 104, 109; *Sturdivant* v. *Seaboard Service System,*

*Ltd., supra*, 459 A.2d 1058, 1059-1060; *Kloch* v. *Ratcliffe* (1985) 221 Neb. 241 [375 N.W.2d 916, 919-921]; *Neece* v. *Kantu* (1973) 84 N.M. 700 [507 P.2d 447, 452-454]; accord, *DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517, 526-533 [235 Cal.Rptr. 292, 733 P.2d 614] [statements made in investigation stage of labor arbitration proceeding are privileged under federal law: "If an employee can institute a civil action, in essence litigating the questions at issue in an arbitration, the value of arbitration as a dispute resolution tool will be undermined." (*Id.* at p. 528.)].)

Accordingly, even if we were to view the issue before us as one of first impression, we would conclude that the litigation privilege of section 47(b)(2) applies to a witness who testifies at a private contractual arbitration proceeding.[8]

## IV

In reaching a contrary conclusion in this case, the Court of Appeal relied very heavily upon the case of *Hackethal* v. *Weissbein, supra*, 24 Cal.3d 55, in which this court, in a closely divided decision, ruled that a quasi-judicial "peer review" proceeding, held before the "judicial commission" of a county medical society (a private association) with regard to the proposed expulsion of a physician from the society, was not an "official proceeding authorized by law" within the meaning of section 47(2), and, as a consequence, that a witness who testified at such a proceeding was not entitled to the absolute privilege afforded by the statute. Plaintiffs also rely heavily upon *Hackethal*, contending that the distinction drawn in that case between governmental and private proceedings should apply in the present context as well. As we shall explain, in our view the *Hackethal* decision provides no basis for concluding that the litigation privilege does not apply to a private contractual arbitration proceeding.

As noted, the issue presented in *Hackethal* v. *Weissbein, supra*, 24 Cal.3d 55, was whether a peer review proceeding conducted by a private medical society was an "official proceeding authorized by law" within the meaning of the then-applicable provisions of section 47. No claim was raised in *Hackethal* that the peer review proceeding was a "judicial proceeding" within the meaning of section 47, and consequently this court in *Hackethal* had no occasion to analyze or interpret the scope of section 47's privilege for

---

[8]Because the statements at issue in the present case were made in the course of a private contractual arbitration proceeding authorized by California's general arbitration statutes (see Code Civ. Proc., § 1280 et seq.), our holding applies to testimony given in such a proceeding. We have no occasion in this case to determine whether the litigation privilege applies to statements made in the course of "alternative dispute resolution" proceedings other than those involving arbitration.

statements made in "any . . . judicial proceeding." Unlike a private contractual arbitration proceeding, the peer review hearing at issue in *Hackethal* was simply a private organization's own *internal* procedure for determining whether the physician should lose his membership in the organization, and was not a substitute for a court proceeding. Moreover, the decision makers in such a peer review proceeding, unlike the arbitrators presiding over a contractual arbitration proceeding, were not protected by the absolute privilege, traditionally accorded officers performing a judicial function, for actions taken at the proceeding. (See § 43.7 [providing a *qualified* privilege for members of medical peer review committees].) A private contractual arbitration proceeding, conducted before a neutral decision maker and intended to resolve a controversy that otherwise would require resort to a court (and that—as in the present case—frequently is ordered as the result of a petition filed in a pending civil action [Code Civ. Proc. § 1281.2]), plainly is much more analogous to a traditional court proceeding than the peer review proceeding at issue in *Hackethal*. Accordingly, the determination in *Hackethal*, that a private peer review proceeding does not fall within the scope of the "official proceeding authorized by law" provision of section 47, is not inconsistent with the conclusion that a private arbitration proceeding constitutes a "judicial proceeding" within the meaning of section 47(b)(2). Indeed, as we have seen, in *Ribas* v. *Clark, supra,* 38 Cal.3d 355, decided six years after *Hackethal*, we applied the litigation privilege to testimony given in such a private arbitration proceeding, without any suggestion, from either the parties or any member of this court, that such a conclusion conflicted with the *Hackethal* decision.

Furthermore, to the extent that plaintiffs rely upon *Hackethal* v. *Weissbein, supra,* 24 Cal.3d 55, as indicative of a more general legislative intent to confine the scope of the absolute privilege accorded in *all* of the subsections of section 47(b) to statements made only in governmental, and not private, proceedings, we believe that an examination of the action taken by the Legislature in response to the *Hackethal* decision completely refutes such a claim.

A brief chronology is instructive. The *Hackethal* decision, *supra,* 24 Cal.3d 55, was filed on April 12, 1979, and elicited a very swift legislative response. One month later, on May 14, 1979, a pending bill (Assem. Bill No. 478) was amended, effectively to overrule the *Hackethal* decision, by adding a new subsection to section 47(b), extending the privilege to "any other proceeding authorized by law and reviewable [by writ of mandate]," namely, to the very type of quasi-judicial, peer review proceedings of private associations that had been at issue in *Hackethal*. (See *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410].)

On May 25, 1979, the Assembly passed the amended version of Assembly Bill No. 478 by a 67-0 vote (3 Assem. J. (1979-1980 Reg. Sess.) p. 5481); less than a month later, on June 19, 1979, the Senate passed the bill by a 29-0 vote (3 Sen. J. (1979-1980 Reg. Sess.) pp. 4727-4728). The Governor signed the bill into law on June 29, 1979. (Stats. 1979, ch. 184, § 1, pp. 403-404.)

The lesson conveyed by this legislative action appears clear. By its immediate, unanimous response to *Hackethal* v. *Weissbein, supra,* 24 Cal.3d 55, the Legislature demonstrated a strong conviction that the absolute privilege afforded by section 47 should not be confined narrowly only to witnesses who testify in peer review proceedings conducted by *governmental* agencies, but rather should apply also to witnesses who testify in analogous peer review proceedings conducted by *private* entities, because the purposes served by the privilege apply equally to such proceedings. This legislative reaction belies plaintiffs' claim that, as a general proposition, the Legislature intended to limit the reach of the section 47(b) privilege only to governmental proceedings.

Thus, in our view, the *Hackethal* decision, *supra,* 24 Cal.3d 55, is not inconsistent with the conclusion that the litigation privilege applies to statements made in a private contractual arbitration proceeding.

## V

Plaintiffs and several amici curiae proffer a number of additional arguments in support of their claim that the litigation privilege of section 47(b)(2) should not be interpreted as applying to private contractual arbitration proceedings. As we explain, we conclude that none of these additional contentions is persuasive.

## A

Plaintiffs claim that the absolute privilege of section 47(b)(2) should not be applied to a witness's testimony at a private arbitration proceeding because such a proceeding often lacks the solemnity and formal trappings of court proceedings held in a public courtroom. Plaintiffs suggest that the absence of such formality increases the risk that a witness may commit perjury. As this court's decision in *Silberg, supra,* 50 Cal.3d 205, 212, makes clear, however, the litigation privilege regularly has been applied "to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, *even though the publication is made outside the courtroom and no function of the court or its officers is involved.*" (Italics added.) Thus, the litigation privilege never has been

limited to statements made before a judge in the confines of a formal public courtroom.

Furthermore, plaintiffs' argument that the statute should be read to limit the reach of the absolute privilege only to testimony given in the formal setting of a courtroom is refuted also by the legislative response to the *Hackethal* decision, *supra*, 24 Cal.3d 55. As we just have discussed, in amending section 47(b) in the wake of *Hackethal*, the Legislature explicitly applied the absolute statutory privilege to testimony given in private, quasi-judicial peer review proceedings, which generally are no more formal or public than a typical private, contractual arbitration proceeding. Indeed, in view of the Legislature's action in amending the statute in response to *Hackethal*, the interpretation of section 47(b)(2) proposed by plaintiffs would create the anomalous circumstance of a witness who testified in a private peer review proceeding being entirely protected from a subsequent tort action on the basis of such testimony, whereas a witness who testified in a private arbitration proceeding—which bears a much greater similarity to a traditional court proceeding—would enjoy no such protection. In view of the Legislature's strong endorsement of the use of arbitration as an alternative to the court system (see, e.g., Code Civ. Proc., § 1141.10, subd. (a); *Moncharsh* v. *Heily & Blase, supra*, 3 Cal.4th 1, 9; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251]), we believe it would be unreasonable for us to construe section 47(b)(2) as creating such a disparity.

B

Plaintiffs next contend that Code of Civil Procedure section 1280.1—which provides that "an arbitrator" in a contractual arbitration proceeding "has the immunity of a judicial officer from civil liability"—reflects a legislative determination not to extend an absolute privilege to statements made by a witness or by other participants in a private contractual arbitration proceeding. Plaintiffs argue that had the Legislature intended to create an immunity from suit for *all* participants (including witnesses) in contractual arbitration, the Legislature specifically would have included all such participants, and not only arbitrators, within the terms of section 1280.1. As we shall explain, plaintiffs' reading of the legislative intent reflected in section 1280.1 does not withstand scrutiny.

Code of Civil Procedure section 1280.1 was enacted in 1985 in response to the Court of Appeal's decision in *Baar* v. *Tigerman, supra*, 140 Cal.App.3d 979 (see *American Arbitration Assn.* v. *Superior Court* (1992) 8 Cal.App.4th 1131, 1133 [10 Cal.Rptr.2d 899]; *Coopers & Lybrand* v. *Superior Court* (1989) 212 Cal.App.3d 524, 534-535 [260 Cal.Rptr. 713]), and

consequently we must consider the *Baar* decision in ascertaining the purpose and significance of this statute.

In *Baar* v. *Tigerman, supra*, 140 Cal.App.3d 979, a party to a contractual arbitration proceeding brought suit against the arbitrator, claiming it had sustained damages as a result of the arbitrator's failure to render a timely award (as allegedly required by the arbitration agreement). In analyzing the issue, the Court of Appeal began its discussion by explicitly recognizing that "[c]ourts of this country have long recognized immunity to protect arbitrators from civil liability for actions taken in the arbitrator's quasi-judicial capacity. [Citation.] Arbitral immunity, like judicial immunity, promotes fearless and independent decisionmaking." (140 Cal.App.3d at p. 982.) The court in *Baar* endorsed this fundamental principle, recognizing that the general doctrine of arbitral immunity applied in California (even though Code of Civil Procedure section 1280.1 had not yet been enacted.)

Although acknowledging that the arbitral immunity doctrine applied in California, the court in *Baar* noted that past cases recognizing arbitral immunity "involved disgruntled litigants who sought to hold an arbitrator liable for *alleged misconduct in arriving at a decision*" (140 Cal.App.3d at p. 983, original italics), and the court viewed the issue in the case before it as presenting the question whether "this court should *extend* immunity to an arbitrator who never renders an award." (*Ibid.*, original italics.) The court recognized that, under comparable circumstances, the immunity accorded a judge would prevent a litigant from bringing a similar tort suit—even against a judge who failed to decide a case within a statutorily prescribed deadline—but concluded that the differences between judicial and arbitral status warranted a more limited immunity for arbitrators. Accordingly, the court in *Baar* held that the proceedings in that case should be permitted to go forward.

In response to the decision in *Baar*, the Legislature enacted Code of Civil Procedure section 1280.1. As initially adopted in 1985, section 1280.1 provided: "An arbitrator has the immunity of a judicial officer from civil liability when acting in the capacity of arbitrator under any statute or contract." (Stats. 1985, ch. 709, § 1, p. 2341.)

Viewed in context, the intent of the Legislature in enacting Code of Civil Procedure section 1280.1 is evident. Whereas *Baar* held that the scope of an arbitrator's immunity is not as expansive as the immunity enjoyed by a judge, section 1280.1 provides that the immunity afforded arbitrators in private arbitration proceedings is *equivalent* to the immunity "of a judicial officer." Thus, section 1280.1 reflects a legislative conclusion that the

differences that exist between arbitration and court proceedings do not warrant affording an arbitrator less protection against tort liability than that conferred upon a judge.

In light of this legislative history, we believe it is unreasonable to suggest that, because Code of Civil Procedure section 1280.1 applies only to arbitrators, we should infer that the Legislature, in enacting that statute, expressed its intent not to afford a similar immunity to other participants in private arbitration proceedings. Section 1280.1 was enacted in response to a specific appellate decision (*Baar* v. *Tigerman, supra,* 140 Cal.App.3d 979) that, in the Legislature's view, improperly limited the scope of the immunity applicable to arbitrators. At the time the Legislature enacted section 1280.1, no decision had suggested that the testimonial privilege traditionally accorded witnesses would not be afforded to witnesses who testify in arbitration proceedings. Indeed, when section 1280.1 was enacted into law in September 1985, this court just recently had held—in *Ribas* v. *Clark, supra,* 38 Cal.3d 355 (decided in March 1985)—that the testimony of a witness in a private arbitration hearing *was absolutely privileged under Civil Code section 47.* Under these circumstances, we must reject the suggestion that the scope of section 1280.1 indicates an intent on the part of the Legislature to limit only to arbitrators the absolute immunity applicable in arbitration proceedings. (Accord, *American Arbitration Assn.* v. *Superior Court, supra,* 8 Cal.App.4th 1131, 1134 [rejecting argument that, because Code Civ. Proc., § 1280.1 refers only to an "arbitrator," the Legislature did not intend to extend immunity to the organization sponsoring an arbitration proceeding]; *Thiele* v. *RML Realty Partners* (1993) 14 Cal.App.4th 1526, 1529-1530 [18 Cal.Rptr.2d 416] [same].)

Moreover, a 1990 amendment of Code of Civil Procedure section 1280.1 confirms that this provision cannot properly be construed as a limitation upon an otherwise applicable immunity afforded by section 47(b). This 1990 amendment added a second paragraph to section 1280.1, providing: "The immunity afforded by this section shall supplement, and not supplant, any otherwise applicable common law or statutory immunity." (Stats. 1990, ch. 817, § 2.)

In sum, we conclude that section 1280.1 provides no support for plaintiffs' contention that the litigation privilege of section 47(b)(2) does not apply to the testimony of a witness at a private contractual arbitration proceeding.

C

Finally, an amicus curiae brief, filed on behalf of several consumer protection organizations, additionally suggests that, as a policy matter, the

litigation privilege of section 47(b)(2) should not be applied to private contractual arbitration proceedings on the ground that arbitration clauses frequently are inserted into consumer contracts on a unilateral basis and are not voluntarily agreed to by consumers. In our view, amici curiae's argument is flawed in two separate respects.

First, to the extent the argument rests upon the asserted unfairness of requiring a consumer to be bound by an arbitration clause thrust upon the consumer in a contract of adhesion, the appropriate remedy would appear to be a direct challenge to the validity of the arbitration proceeding itself (see, e.g., *Patterson* v. *ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1663-1667 [18 Cal.Rptr.2d 563]), rather than the adoption of a novel rule that would subject a witness, who happens to be called upon to participate in such a proceeding, to potential tort liability. In essence, the asserted wrong of which amici curiae complain does not appear logically to support the proposed remedy.[9]

Second, to the extent that amici curiae's argument rests upon an assumption that withholding the litigation privilege from arbitration proceedings will work to the advantage of individual consumers, we believe the argument is based upon a questionable premise. Because of the relatively low cost and efficiency of the arbitration process, an individual consumer involved in a typical consumer dispute frequently will find an arbitral forum more accessible than the more expensive and cumbersome court system. (See, e.g., *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 711-712 [131 Cal.Rptr. 882, 552 P.2d 1178].) Furthermore, when consumers are involved in an arbitration proceeding, they are as likely as their adversaries to require the assistance of witnesses—witnesses who, as already explained, may well be deterred from testifying, or from testifying fully and candidly, without the protection of the litigation privilege. Indeed, in view of the disparity in resources between an individual consumer and an institutional adversary, it appears reasonable to suspect that, were this court to adopt a rule permitting a witness who testifies at an arbitration proceeding to be subjected to a collateral tort action, an individual consumer probably would be at a relative disadvantage in securing the testimony of witnesses, because such witnesses presumably would recognize that the consumer's institutional adversary has the financial resources to pursue just such a retaliatory action against them. Thus, we believe that consumers are, at the very least, as likely as other

---

[9]Moreover, the Legislature specifically has encouraged the use of arbitration clauses in the type of medical services contract involved in the present case (see *Gross* v. *Recabaren* (1988) 206 Cal.App.3d 771, 776 [253 Cal.Rptr. 820]), and has provided explicitly that, so long as the arbitration clause complies with several statutorily prescribed conditions, "[s]uch a contract is not a contract of adhesion, nor unconscionable nor otherwise improper . . . ." (Code Civ. Proc., § 1295, subd. (e).)

participants to benefit from application of the litigation privilege to arbitration proceedings.

Accordingly, in our view, amici curiae's arguments against applying the litigation privilege to private contractual arbitration proceedings are unpersuasive and provide no justification for departing from the established rule.

## VI

For the reasons discussed above, we conclude that statements made in the course of a private contractual arbitration proceeding are protected by the litigation privilege embodied in section 47(b)(2).

The judgment of the Court of Appeal is reversed, and the matter is remanded to the Court of Appeal with directions to affirm the judgment of the superior court.

Lucas, C. J., Arabian, J., and Sills, J.,* concurred.

**BAXTER, J.**—I respectfully dissent. I would affirm the judgment of the Court of Appeal which, in my view, correctly held that the allegedly perjurious statements of defendant were not privileged communications.

The majority hold that the "litigation privilege," one which immunizes libel, perjury, and other tortious conduct by participants and witnesses in judicial proceedings against civil liability, applies to witnesses and other participants in contractual arbitration proceedings. I cannot join this judicial expansion of a statute which, but for this court's legislative efforts, one might have believed to be clear on its face.

Two things should be made clear. First, the communications privilege created by the Legislature was for communications *made in a judicial proceeding.* (Civ. Code, § 47, subd. (b)(2).)[1] Second, the Legislature has considered the private arbitration setting and has created an immunity of limited duration *exclusively for arbitrators.* (Code Civ. Proc., § 1280.1.) When construing a statute the role of the court "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; . . . ." (Code Civ. Proc., § 1858.) The court's purpose is to effectuate the intent of the Legislature. (Code Civ. Proc., § 1859.) Nothing in the majority reasoning supports

---

*Presiding Justice, Court of Appeal, Fourth Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

[1]All statutory references are to the Civil Code unless otherwise indicated.

a conclusion that "judicial proceeding" includes private arbitration or that it was the intent of the Legislature that subdivision (b)(2) of section 47 apply to private contractual arbitration.

Today, when a statute, not the common law, governs immunity from suit in this state, a decision to extend immunity to witnesses is a prerogative. Unless it is compelled by constitutional mandate or the issue before it falls within the inherent power of the court over judicial administration and procedure, the court has no power to create immunities in an area in which the Legislature has spoken. For example, this court has no authority to recognize nonstatutory evidentiary privileges, the class of privileges which may be asserted to maintain confidentiality of communications. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 274, fn. 3 [208 Cal.Rptr. 152, 690 P.2d 625].) In the past the court has recognized some nonstatutory common law immunities. (See, e.g., *Emery* v. *Emery* (1955) 45 Cal.2d 421 [289 P.2d 218].) Nonetheless, immunity is an exception to the principle that liability is the rule. (§§ 1708, 3333, 3523; *Gibson* v. *Gibson* (1971) 3 Cal.3d 914, 922 [92 Cal.Rptr. 288, 479 P.2d 648].) Because liability is the rule, modern courts are reluctant to create or continue to recognize exceptions that deny an injured party the right to compensation. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173].) A court may do so only if immunity is essential to achieve the goals of an important public policy and is not inconsistent with a legislative determination that immunity is inappropriate or should be limited.

In areas in which the Legislature has created a limited statutory immunity, the court must presume that the Legislature has weighed the competing considerations in defining the scope of that immunity. When, as here, the Legislature has acted, it is inappropriate for the court to recognize preexisting nonstatutory immunities or to expand the statutory immunity unless it is clear that the Legislature did not intend the statutory immunity to be exclusive. (*Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 158 [185 Cal.Rptr. 244, 649 P.2d 886]; *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352].) The legislative decision to create an immunity such as the communications privilege in issue here involves a balancing of substantial, competing considerations. The majority usurp that legislative function by undertaking that balancing themselves and by extending immunity to witnesses in contractual arbitration proceedings. The court is ill-equipped to do so.

In their eagerness to shift dispute resolution from the courts to arbitration the majority ignore the differences between contractual arbitration and judicial proceedings and engage in assumptions unsupported by the record or

by fact as to the practical impact of contractual arbitration on participants. Among those unsupported and insupportable assumptions is the assumption that contractual arbitration is relatively low cost and efficient when compared to a judicial proceeding. That assumption overlooks the thousands of individuals who, but for arbitration provisions inserted into employment agreements, consumer contracts, bank customer agreements, leases, and other contracts, would resolve their disputes at much less cost and more quickly in small claims court, and, in many cases in municipal or superior court. For this and other well-founded reasons, the paternalistic assumption of the majority that arbitration is a preferable means of dispute resolution is not universally shared. (See Reuben, *The Dark Side of ADR* (Feb. 1994) 14 Cal.Law. 53; Brand, *Steps You Can Take to Avoid That 'Dark Side of ADR'* (Mar. 4, 1994) S.F. Daily J., at p. 5, col. 1; Guill & Slavin, *Rush to Unfairness: The Downside of ADR* (Summer 1989) 3 Judges' J. 8; Yamamoto, *Efficiency's Threat to the Value of Accessible Courts for Minorities* (1990) 25 Harv. C.R.-C.L. Rev. 341, 360-361; Rowe, *American Law Institute Study on Paths to a "Better Way": Litigation, Alternatives, and Accommodation: Background Paper* (1989) Duke L.J. 824, 901; Edwards, *Alternative Dispute Resolution: Panacea or Anathema?* (1986) 99 Harv.L.Rev. 668; Brunet, *Questioning the Quality of Alternative Dispute Resolution* (1987) 62 Tul. L.Rev. 1; Delgado et al., *Fairness and Formality: Minimizing the Risk of Prejudice in Alternative Dispute Resolution*, 1985 Wis. L.Rev. 1359.) Neither the law nor the assumptions of the majority support the holding.

I

*The Litigation Privilege*

The statute, not what the majority think the law should be, is controlling. In that part of section 47 on which the majority bases its holding that the defendant is immune from any suit arising out of the deposition testimony he gave in this contractual arbitration proceeding, the Legislature provided: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) *In any . . . (2) judicial proceeding . . . .*" (Italics added.)

The majority candidly acknowledge that it was the court, not the Legislature, which expanded that grant of immunity to cover any communication made in the course of, or in anticipation of, litigation even though it is not made in a "judicial proceeding" and does not involve either the court or its officers. (Maj. opn., *ante*, pp. 640-641; *Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].) That legislative effort having been accomplished, the majority now take the position that the extension of the litigation privilege to contractual arbitration as a proceeding to which the litigation privilege applies is also settled by prior case law. I disagree.

The majority's assertion that the court has already held that arbitration proceedings are within the privilege created by subdivision (b)(2) of section 47 is supported only by a single sentence in *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417], that the plaintiff in that case "concedes, as he must, that an arbitration hearing falls within the scope of this privilege because of its analogy to a judicial proceeding." Assuming, as the majority's lengthy exposition concludes, that concession was a "holding" of the court, it is not sound precedent and should be reconsidered for reasons I address below.

I do not believe that statement has precedential value however. "When . . . a decision treats an issue in a 'summary and conclusory' manner, and is 'virtually devoid of reasoning,' its authoritative status is undermined. (*City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 533 [162 Cal.Rptr. 327, 606 P.2d 36].)" (*McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 358 [261 Cal.Rptr. 318, 777 P.2d 91].) This is particularly true when the issue is one of first impression. (See *I.J. Weinrot & Son, Inc.* v. *Jackson* (1985) 40 Cal.3d 327, 336 [220 Cal.Rptr. 103, 708 P.2d 682].) The law of this state is not determined on the basis of a party's concession and the court's assumption that the concession of law is valid. Only when the issue is squarely raised by the parties and considered by the court in a decision reflecting analysis of the legal issue and reasoning supporting the conclusion is the ruling an authoritative holding. The Constitution of California demands no less. ( Cal. Const., art. VI, § 14.)[2]

---

[2]Article VI, section 14, mandates: "Decisions of the Supreme Court and courts of appeal that determine causes shall be in writing with reasons stated."

That requirement was not part of the 1850 Constitution. It was added as part of section 2 of article VI in the Constitution of 1879 for the express purpose of ensuring careful consideration of legal issues and providing the guidance which the court's analysis and reasoning would afford the bench and bar of this state. At the time the written opinion requirement was added, the Constitution provided: "In the determination of causes, all decisions of the Court in bank or in departments shall be given in writing, and the grounds of the decision shall be stated." (Cal. Const. of 1879, art. VI, § 2.)

When the requirement was proposed by the Committee on the Judiciary during the 1878-1879 Constitutional Convention, Delegate Wilson explained its purpose to the delegates sitting as a Committee of the Whole. "The importance of requiring the Court to give written opinions cannot be overrated. They . . . become the settled law of the State, and are precedents for subsequent cases, . . . [¶] . . . [T]hroughout the United States the Courts are required to deliver written opinions, stating the grounds of the decision, as ·we have provided in this section. Undoubtedly it will insure a careful examination of the cases, and result in well considered opinions, because they must come before the jurists of the country and be subjected to the severest criticism. . . . [¶] . . . [¶] . . . Of course, there will always be some cases disposed of without written opinions. Sometimes a case goes off on some formal motion, or is dismissed on a technical question of practice. But I am speaking generally, of cases argued and submitted upon their merits, and there the decision is of little account as

Implicitly conceding that *Ribas* v. *Clark, supra,* 38 Cal.3d 355, is not sufficiently authoritative,[3] the majority do not rely solely on the "holding" of that case. As further support for the result, the majority adopts the reasoning by which the expansion of section 47, subdivision (2) to immunize communications not made "in a judicial proceeding" was justified to support a conclusion that contractual arbitration should be equated to a "judicial proceeding" and thus brought within the umbrella of immunity provided by the statute. That reasoning is not persuasive in this context.

I do not dispute the majority's statement of the purpose underlying the immunity granted by subdivision (b)(2) of section 47. That purpose is to ensure that litigants and witnesses have free access *to the court,* and to encourage frank and full testimony, all of which might be compromised if the parties and witnesses were threatened by the possibility of a lawsuit based on communications necessary to prosecution of an action. Arbitration is increasingly being used to *deny* access to the court, however. Extending the litigation privilege to private contractual arbitration encourages institutional parties to abandon the judicial system. It does nothing to ensure access to the court for consumers and other individuals on whom arbitration agreements are imposed, but who would otherwise choose judicial proceedings over arbitration.

The majority fails to acknowledge, moreover, that while the deterrent effect of a possible action for libel and/or perjury may not be essential to the fundamental truth-finding function to which legal actions are directed, the same cannot be assumed in private contractual arbitration. The Legislature may well have concluded that trial and appellate procedures inherent in a legal action are adequate to ensure both that the truth is ascertained, thus protecting the litigants and others who might be injured by libelous or perjurious statements of parties and witnesses, and that the credible evidence is sufficient and the law correctly applied to the facts on which the action is

---

settling the law, unless the Court gives its reasons for the decision in writing." (2 Debates & Proceedings, Cal. Const. Convention 1878-1879, pp. 950-951.)

During the subsequent debate on the provisions of article VI affecting the Supreme Court, Mr. Wilson again explained: "[O]pinions must be written by a Court of last resort as matters of precedent. It is a very different thing from sitting down and saying that the judgment of the Court below is reversed or affirmed without giving any reasons, because when that is published, nobody knows whether that decision is right or wrong. But when the Judge has to sit down and write an opinion, or . . . they must give their opinion in writing, stating the grounds of the decision, then they are brought before the whole bar of the State, and they are bound to present themselves in a position where law and reason sustain the adjudication." (3 Debates & Proceedings, Cal. Const. Convention 1878-1879 at p. 1455.)

[3]The doubtful status of the party concession in *Ribas* v. *Clark, supra,* 38 Cal.3d 355, as a holding or as precedential authority is more than adequate explanation of the Legislature's failure to "overrule" that "holding."

predicated. Those protective procedures are guaranteed only in a judicial proceeding, however, and the Legislature has not determined that the truth-seeking mechanisms of private contractual arbitration are sufficient to warrant withdrawal of the parties' right to seek damages in a civil tort action when those mechanisms fail because participants and witnesses engage in perjury.

Since the majority do not address the factors that inform the legislative decision to create immunity, I do so.

1. Foremost among the features which deter perjury in a judicial proceeding is the fact that a judicial proceeding is a public proceeding. The trial is open to the press and public and a record of the proceeding is available to the press and the public. Since litigants and witnesses are aware that their statements are subject not only to cross-examination and impeachment, but also to public scrutiny, the possibility that perjury will be exposed acts as a deterrent to perjury.

2. The judge and jury are neutral decision makers. Neither is dependent upon the parties to litigation for income. This neutrality ensures, to the greatest extent possible, that perjury will be recognized and a just decision rendered.

3. Witnesses are sworn to tell the truth.

4. Discovery is available to the parties. The ability to discover the evidence upon which the opponent's case rests enables the parties to prepare effective cross-examination and to obtain and present impeaching evidence.

5. The trier of fact is required to follow the law, and review for errors of law or insufficiency of credible evidence is available by appeal.

The Legislature has determined that those protections are sufficient to warrant denying a litigant the right to a civil action against a perjurious witness. It has not done so with regard to arbitration for good reason. That reason is that comparable protections are not guaranteed in private contractual arbitration. By contrast:

1. Arbitration proceedings are private. None of the formality of a judicial proceeding surrounds an arbitration hearing. Rules governing judicial procedure are not applicable. (Code Civ. Proc., § 1282.2, subd. (d).)

2. The arbitrator, or arbitrators, are dependent upon the parties for their income. They are not required by law to take an oath of fairness and

impartiality. Institutional litigants whose contracts relegate all disputes to arbitration are the major source of income for many arbitrators. Many serve repeatedly as arbitrators for institutional clients. (See, e.g., *Kaiser Foundation Hospitals, Inc.* v. *Superior Court (Coburn)* (1993) 19 Cal.App.4th 513 [23 Cal.Rptr.2d 431]; *Neaman* v. *Kaiser Foundation Hospital* (1992) 9 Cal.App.4th 1170 [11 Cal.Rptr.2d 879]; see also, Note, *The Impression of Possible Bias: What a Neutral Arbitrator Must Disclose in California* (1993) 45 Hastings L.J. 113.) Neutral decisionmaking is not, and cannot be, guaranteed under these circumstances. The likelihood that the testimony of a witness who regularly appears on behalf of an institutional client will be perceived as perjurious is necessarily diminished.

3. Witnesses need be sworn only on request of a party and the rules of evidence do not apply. (Code Civ. Proc., § 1282.2, subd. (d).)

4. Discovery is not guaranteed. Depositions are available only as evidence, not for discovery purposes, except in matters involving personal injury or death, and then only if the arbitrator grants a party's application. (Code Civ. Proc., §§ 1283, 1283.05.) Only in actions involving personal injury or death, or claims of damage in excess of $50,000, may a party demand that the other party provide a list of witnesses prior to the hearing. (Code Civ. Proc., § 1282.2, subd. (a)(2).) Failure to list a witness is not a bar to admission of that witness's testimony. (Code Civ. Proc., § 1282.2, subd. (a)(2)(E).)

The likelihood that a party will be able to mount an effective cross-examination when the nature of a witness's proposed testimony is not known prior to the hearing is significantly reduced, as is the ability of the party to marshal other evidence to counter that testimony at the hearing.

5. No record need be kept. The content of a witness's testimony is not preserved· and thus not open to posthearing scrutiny by third parties. A witness may therefore give conflicting testimony in separate arbitration proceedings without fear of exposure.

6. No appellate or any judicial review is available for insufficiency of credible evidence. The ruling of the arbitrator is final insofar as the factfinding process is involved. (*Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 9-11 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

The assertion of the majority that private contractual arbitration is comparable to a judicial proceeding is, in the end, based only on its purpose of adjudicatory dispute resolution. What is omitted in this reasoning is any

mention of the fact that the procedure for a private contractual arbitration hearing is not established by statute, but by the contract between the parties. The provisions of Code of Civil Procedure sections 1282 and 1282.2,which offer a skeleton procedural format for the conduct of arbitration proceedings, are default procedures. Each section is expressly applicable "[u]nless the arbitration agreement otherwise provides, or unless the parties to the arbitration otherwise provide . . . ." (*Ibid.*)

There is, therefore, no single or even standard format for private contractual arbitration. None of the safeguards and procedures available to a party in a judicial proceeding to expose false testimony are guaranteed in private contractual arbitration. Although cross-examination may be assumed to be permitted in all such proceedings, it is not cross-examination by an attorney or party who is informed by discovery of impeaching evidence.

The majority nonetheless withdraw from persons forced into arbitration the only meaningful deterrent to perjury, an action against the perjurious witness whose misconduct may have denied them recovery or may have resulted in the unjust imposition of liability upon the party. Only the Legislature has the power to deny an individual the right to a civil action for such injury.[4] It has not done so and this court should not. Indeed, until today, the court acknowledged that expansion of the immunities established by section 47 was, and should be, a legislative prerogative, and that statute, not common law, is the source of immunities in this state.

The court has repeatedly recognized this limitation on its authority. Addressing the limited statutory privilege for libel, we rejected any judicial expansion, stating: "[T]he Legislature has not as yet adopted the section 592A [of the Restatement Second of Torts] privilege . . . . We have held that all questions regarding the applicable privileges in libel actions were resolved by the adoption of section 47. (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 378-379 [295 P.2d 405].) Accordingly, it would seem improper for us judicially to create an additional privilege, especially one which is considerably broader than the existing statutory privileges. Moreover, the grant of privileges in defense of a defamation action involves matters of public policy. (See *Kachig* v. *Boothe* (1971) 22 Cal.App.3d 626, 641 [99 Cal.Rptr. 393].) Deferring to legislative judgment, we decline to impose either our own or the Restatement's views of policy, especially in an area in which the Legislature has spoken so extensively." (*Slaughter* v. *Friedman, supra,* 32 Cal.3d 149, 158.) The majority offer no justification for a departure from

---

[4]Section 3281: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

this deference to legislative judgment in the context of the litigation privilege.

More recently, the court again declined to expand a statutory privilege in *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711 [257 Cal.Rptr. 708, 771 P.2d 406]. There, what is now subdivision (c) of section 47 was in issue. That section creates a qualified privilege for communications "without malice, to a person interested therein, (1) by one who is also interested . . . ." (§ 47, subd. (c)(1).) Defendant sought a construction or expansion of the immunity to encompass media publication to the general public about a private person. Concluding that the statute could not be construed that broadly, and rejecting an argument that public policy supported such an expansion we recognized that "[s]uch changes require analysis of empirical data and are better dealt with in the legislative arena. [Citation.] Section 47[, subdivision (c)] is a creation of the Legislature, which can act accordingly if it believes the statute should be expanded." (48 Cal.3d 711, 740.)

Neither the necessity for expansion of the section 47 communication privileges nor the possible need to extend those privileges to arbitration has been overlooked by the Legislature. It has created numerous additional communication privileges since section 47 was enacted in 1872. (See, e.g., §§ 43.8 [immunity for communication on evaluation of practitioner of healing arts], 47, subd. (b)(4) [communications in proceedings authorized by law and reviewable by mandate], 48.5 [immunity for owner, licensee, or operator of broadcasting station for defamation broadcast over radio by agent or employee], 48.7 [immunity against libel or slander action while child abuse charges pending for report of abuse]; Bus. & Prof. Code, § 2318 [communication of information to licensing board of information regarding possible drug dependence, alcohol abuse, or mental illness of licensee].)

The addition of subdivision (b)(4) to section 47 demonstrates that the Legislature is responsive when it believes that statutory communication immunities should be expanded for reasons of public policy. As the majority recognize, that provision was added in response to this court's holding in *Hackethal* v. *Weissbein* (1979) 24 Cal.3d 55 [154 Cal.Rptr. 423, 592 P.2d 1175, 9 A.L.R.4th 791], that a peer review proceeding of a medical society was not an "official proceeding authorized by law" and thus the communications privilege of what is now subdivision (b)(3) of section 47 was inapplicable. That legislative response was appropriately narrow, however. It did not, as defendant argues, extend immunity to any private hearing that might be described as "quasi-judicial." (See *Cuenca* v. *Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985 [225 Cal.Rptr. 852].)

Again, following a Court of Appeal decision holding that an arbitrator serving in a private contractual arbitration proceeding did not enjoy complete judicial immunity (*Baar* v. *Tigerman* (1983) 140 Cal.App.3d 979 [211 Cal.Rptr. 426, 41 A.L.R.4th 1004]), the Legislature responded by enacting Code of Civil Procedure section 1280.1 in 1985. That section created the "immunity of a judicial officer from civil liability" for arbitrators acting as such pursuant to statute or contract. In 1990, the section was amended to also provide that the immunity would "supplement," and not supplant "any otherwise applicable common law or statutory immunity," reflecting the Legislature's acceptance of the existence of common law immunity of judges. (See *Pickett* v. *Wallace* (1881) 57 Cal. 555, 557; *Turpen* v. *Booth* (1880) 56 Cal. 65; *Downer* v. *Lent* (1855) 6 Cal. 94; *Oppenheimer* v. *Ashburn* (1959) 173 Cal.App.2d 624, 631 [343 P.2d 931]; *Perry* v. *Meikle* (1951) 102 Cal.App.2d 602, 605 [228 P.2d 17]; *Wyatt* v. *Arnot* (1907) 7 Cal.App. 221, 227 [94 P. 86].)

The Legislature did not create immunity for, or thereby recognize, common law immunity of, witnesses in private contractual arbitration proceedings, however. The legislative response was a "*legislative policy* determination that in view of overwhelming court congestion, complete immunity was essential to encourage persons to serve as arbitrators." (*Coopers & Lybrand* v. *Superior Court* (1989) 212 Cal.App.3d 524, 535 [260 Cal.Rptr. 713], italics added.) Even the decision that arbitrators should enjoy immunity was tentative. As enacted the immunity provision expired by its own terms on January 1, 1991, unless extended. (Stats. 1985, ch. 709, § 1, p. 2341.) It has since been extended, but again for only a limited period and will expire on January 1, 1996, unless a further extension is enacted. This is hardly a resounding legislative endorsement of immunity for arbitrators, and says nothing about immunity for witnesses and participants in private contractual arbitration. The limited nature of the grant of immunity by a Legislature that was clearly aware of the importance of arbitration is indicative of legislative intent to restrict immunity in the arbitral arena. The majority encroach on the policymaking sphere of the legislative branch by expanding the statutory grant of immunity to encompass participants and witnesses in private contractual arbitration.

It is no answer to say that the parties have agreed to arbitrate, and to accept the loss of the right to a civil tort action for perjury, when standard form consumer contracts include an arbitration provision that is often neither read nor understood by the consumer. (See, e.g., *Patterson* v. *ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659 [18 Cal.Rptr.2d 563].) Nor is it sufficient to say that the consumer may avoid the impact of the arbitration

provision by establishing that the contract is one of adhesion.[5] To a consumer who would otherwise litigate a claim in small claims court, the prospect of avoiding the arbitration clause of a contract by retaining an attorney and initiating a civil action is not a realistic alternative. Only when the contract has been negotiated by sophisticated parties of equal bargaining power can it be said that a voluntary and knowing waiver of the right to subsequent suit against a perjurious witness has been made in exchange for the "benefits" of arbitration.[6]

Although not relevant to the question of whether section 47, subdivision (b)(2), encompasses private contractual arbitration, response must be made to the majority's assumption that arbitration is less costly than a judicial proceeding. It most certainly is not to the consumer who, but for the arbitration clause in a contract, would resolve a claim in small claims court, or represent himself or herself in the municipal or superior court. Arbitrator's fees for one leading arbitration service in this state are typically in the $350 to $500 *per hour* range! (Reuben, *King of the Hill* (Feb. 1994) 14 Cal.Law. 55.) In addition, there may be filing or service fees with the arbitration service, fees for discovery, and fees for written findings and expedited hearings. (See, e.g., *Patterson* v. *ITT Consumer Financial Corp., supra*, 14 Cal.App.4th 1659, 1665, fn. 3.) That expense and the expenses of the arbitrator or arbitrators, if more than one is called for in the contract, must be shared by the parties. The arbitrator's fees are not limited to the time of hearing itself, but include prehearing conferences which the arbitrator or a party may require, mediation or settlement conferences which may be ordered, and the time devoted to preparation of the award. (See generally, Judicial Arbitration & Mediation Services, Inc., J.A.M.S. Rules of Practice & Procedure (1992); American Arbitration Association, Commercial Arbitration Rules (1992).)

---

[5]Some "imposed" arbitration agreements may not be avoided on that ground. The Legislature has provided that a contract for medical services is "not a contract of adhesion, nor unconscionable nor otherwise improper" if it complies with statutory requirements which attempt to ensure notice. (Code Civ. Proc., § 1295, subd. (e).)

[6]In their paper for the Judicial Administration Division of the American Bar Association, James L. Guill and Edward A. Slavin, Jr., expressed similar concerns, concluding that alternative dispute resolution may be "highly inappropriate" when parties are unequal in financial resources or experience. They suggest that individual plaintiffs should not "be forced to submit their claims to someone who may be biased, or less than qualified, or unethical, or who for lack of statutory or regulatory control is less accountable and whose decisions may not be subject to judicial review." (Guill & Slavin, *Rush to Unfairness: The Downside of ADR, supra*, 3 Judges' J. at p. 10.)

The authors express particular concern that the absence of judicial review removes "a major bulwark against arbitrary and capricious decisions, prejudicial error, inequity, and inequality." (Guill & Slavin, *Rush to Unfairness: The Downside of ADR, supra*, 3 Judges' J. at p. 12.)

## II

### *The Official Proceeding Privilege*

I would also reject the argument of defendant and the several amici curiae representing groups and organizations which utilize contractual arbitration as a preferred means of dispute resolution that communications made in the course of private contractual arbitration fall within the privilege established by subdivision (b)(3) of section 47 for official proceedings. Private contractual arbitration is not an official proceeding within the contemplation of that subdivision.

In subdivision (b)(3) of section 47, the Legislature has created immunity for communications "in any other official proceeding authorized by law." Section 47 was enacted as part of the Civil Code in 1872. At that time, the "official proceeding" privilege (then designated section 47, subdivision 2(3)) was described simply as one applicable to a communication made while "testifying as a witness in any proceeding authorized by law to a matter pertinent and material, or in reply to a question allowed by the tribunal." The provision was amended in 1874 to describe the proceedings in which communications were privileged with greater specificity. Pursuant to the 1874 amendment a privileged communication was one made only in "any legislative or judicial proceeding, or in any other official proceeding authorized by law." (§ 47, subd. Two; Code Amends. 1873-1874, ch. 612, § 11, p. 184.) Although other parts of section 47 have been amended in the interim, the language of subdivision 47(b)(3) has not been changed since 1874.

At the time of its enactment in 1872, section 47 included, in what was then the fourth subdivision, a privilege (see now § 47, subd. (d)) which complements the official proceedings privilege, a privilege for news reports of statements made in the proceedings covered by the second subdivision. That fourth subdivision extended the privilege to a publication made in "a fair and true report in a newspaper, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof."

At the same time the Legislature included a similar privilege in the Penal Code of 1872. As enacted in that year, former section 254 of that Penal Code provided:

"No reporter, editor, or proprietor of any newspaper is liable to any prosecution for a fair and true report of any judicial, legislative, or other public official proceedings, or of any statement, speech, argument, or debate

in the course of the same, except upon proof of malice in making such report, which shall not be implied from the mere fact of publication."

The notes of the Code Commissioners who drafted the Civil Code offer no insight into their understanding of the term "official proceedings." The explanatory authority cited referred only to the privilege for communications to interested persons which was then found in former subdivision 3 of section 47, and to a judicial proceeding.[7] The Code Commissioners' Note accompanying former section 254 of the 1872 Penal Code makes reference to the decision in *Sanford* v. *Bennett* (1861) 24 N.Y. 20, in which the court held that a New York statute creating such a privilege applied only to "judicial and legislative proceedings, and to transactions resembling them, and not to an executive act to be performed by a single person and admitting of no deliberation . . . ." (Ann. Pen. Code of 1872, foll. § 254.)[8]

Like section 47, subdivision (b)(3), which is among the Civil Code provisions addressed to civil actions for defamation, former section 254 of the Penal Code was among the provisions which then permitted criminal prosecution for libel. The inclusion in both the Civil Code and the Penal Code of a privilege for news reports of statements made during "public" official proceedings strongly suggests that although that "public" limitation was not express in subdivision 2 of the original section 47, the legislative intent was to create a privilege applicable only to statements made in public, i.e., governmental, official proceedings.

I recognize the rule of statutory construction " 'that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' " (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 725.) In this context, however, that rule would seem to be irrelevant since there is no reason to believe that in 1872 the Legislature had nongovernmental "official proceedings" in mind. That it did not is suggested by the Legislature's subsequent use of the descriptive phrase

[7]See *Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, 728-729, footnote 15. Those citations were: "Perkins vs. Mitchell, 31 Barb., p. 461; Lewis vs. Chapman, 16 N.Y., p. 369; Thorn vs. Moser, 1 Denio, p. 488; 1 Hilliard on Torts, p. 317." (1 Ann. Civ. Code of 1872, foll. § 47.)

[8]The privilege for news reports of statements made in official proceedings was taken from the New York Civil Code which at that time provided in section 25: "No person is liable for publishing a fair and true report in a newspaper, of any judicial, legislative or other public official proceeding, or of anything said in the course of the same, except upon extrinsic proof of actual malice."

The New York Commissioners of the Code cited *Lewis* v. *Chapman* (1857) 16 N.Y. 369, and the New York Laws of 1854, chapter 130, as authority for the provision which also addressed communications to an interested person, a subject which became subdivision 3 of the 1872 version of section 47.

"legislative or judicial proceeding, or in any other official proceeding authorized by law" in the 1874 amendment. (Code Amends. 1873-1874, ch. 612, § 11, p. 184.) The rule of *ejusdem generis* aids in the construction of a statute if there is ambiguity. Under that canon " 'where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' " (*Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676].) The relevance of the rule is particularly apparent here where the Legislature felt it necessary to amend the statute to clarify the nature of the proceedings to which the privilege applied, the original version having described them only as "any proceeding authorized by law."

The court reached the same conclusion after reviewing the history of section 47 in *Hackethal* v. *Weissbein, supra*, 24 Cal.3d 55. There the court held that an "official proceeding authorized by law" did not include nongovernmental proceedings. The purpose of the 1874 amendment, the court reasoned, was to make it clear that the "proceeding authorized by law" to which the 1872 statute extended an absolute communication privilege were only official governmental proceedings. It was for that reason that the Legislature found it necessary to enact section 43.8 in 1974 to create a qualified privilege for communications to various committees and licensing organizations that were intended to assist in evaluating the qualifications of medical practitioners. The Legislature specified in that statute that the new privilege was "[i]n addition to the privilege afforded by Section 47." (§ 43.8.) The court noted in that regard: "The enactment of section 43.8 makes sense because section 47, subdivision 2 [now section 47, subdivison (b)], applies exclusively to government agencies." (24 Cal.3d at p. 61.)

The Legislature apparently accepted that understanding of section 47, as it then amended subdivision 2, now subdivision (b), of that section to extend the absolute privilege to any proceedings reviewable by writ of mandate. (Stats. 1979, ch. 184, p. 403; see *Wallin* v. *Vienna Sausage Manufacturing Co.* (1984) 156 Cal.App.3d 1051, 1055 [203 Cal.Rptr. 375], text accompanying fn. 4.) "It is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction." (*Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161].)

After the 1979 amendment of section 47, when the court considered the scope of the privileges it established in *Slaughter* v. *Friedman, supra,* 32 Cal.3d 149, the court again concluded that the only nongovernmental official proceedings for which section 47 created a privilege were adjudicatory proceedings reviewable by writ of mandate. "[T]he Legislature added clause 4 to subdivision 2 [now subdivision (b)] of section 47, applying the privilege to proceedings authorized by law and reviewable by mandate. It is clear, however, that the private processing of dental claims does not fall within this newly extended category." (32 Cal.3d at p. 156.)

Defendant acknowledges that *Hackethal* v. *Weissbein, supra,* 24 Cal.3d 55, may be read as excluding private arbitration contractual proceedings from the scope of the section 47, subdivision (b)(2) privilege, and urges the court to limit or overrule that decision. He argues that *Hackethal* addressed only the privileged status of the medical society proceedings at issue in that case, and the failure of the majority to discuss arbitration and other "quasi-judicial" private proceedings implies that the court did not intend to eliminate the privilege in arbitration proceedings. Those proceedings, he suggests, were "pseudo-judicial," and the court's holding that they were not subject to the privilege should not be extended to "quasi-judicial" proceedings such as private arbitration.

The flaw in that argument lies in its failure to recognize that the basis for the court's holding in *Hackethal* v. *Weissbein, supra,* 24 Cal.3d 55, 60-61, was that the Legislature did not intend section 47, subdivision (b)(2) to apply to nongovernmental proceedings. Whether or not the proceeding resembled a judicial proceeding was not dispositive. The court was, quite obviously, aware of the potential impact of its holding on other "quasi-judicial" private proceedings, including arbitration. The dissent made that potential impact clear.

I agree with the conclusion of the Court of Appeal that *Hackethal* is dispositive of defendant's claim that the official proceeding privilege immunizes his statements and conduct.

I would affirm the judgment of the Court of Appeal.

Mosk, J., and Kennard, J., concurred.

Appellants' petition for a rehearing was denied June 30, 1994. Werdegar, J., did not participate therein. Mosk, J., Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.